UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION

|  |  |  |
|---|---|---|
| | | Civil Action No. _____ |
| MAGNUS PERSSON, Derivatively on behalf of DIODES, INC. | § § § | |
| Plaintiff, | § § | |
| vs. | § § | |
| KEH-SHEW LU, RAYMOND SOONG, C.H. CHEN, MICHAEL R. GIORDANO, L.P. HSU, JOHN M. STITCH, MICHAEL K.C. TSAI, | § § § § § | |
| Defendants, | § § | |
| DIODES, INC. | § § | |
| Nominal Defendant | § § § § | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT AND INSIDER TRADING**

1.      Plaintiff Magnus Persson ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, for the benefit of nominal defendant Diodes, Inc. ("Diodes" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from February 2011 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      Diodes is a publicly traded company which designs, manufactures, and supplies application specific standard products in the discrete, logic, and analog semiconductor markets primarily in Asia, North America, and Europe.  These semiconductors provide electronic switching functions and signal amplification and, as such, are basic components in consumer electronics, computing, communications and automotive products.  Diodes' business model focuses on what it describes as application specific, standard products for the semiconductor market.  Diodes was founded in 1959 and is headquartered in Plano, Texas.  The Company's primary manufacturing facilities are located in  Shanghai, China.

3.      Throughout the Relevant Period, defendants breached their fiduciary duties by, among other things, causing to be published on behalf of Diodes, material misrepresentations concerning: (i) the Company's increasing assembly and test capacity; and (ii) substantial labor shortages at its Shanghai, China plants.  Defendants also permitted themselves (which include senior officers and directors of the Company) to engage in insider sales of Diodes stock at artificially inflated prices via their inside, non-public information about the foregoing material facts.

4.      On February 9, 2011, defendants reported that the  Company was increasing its

assembly and test capacity, but its "manufacturing output" was being affected by labor shortages in Shanghai. Defendants attributed those shortages to reduced work days in February, workers not returning after the Chinese New Year holiday and government programs encouraging workers to seek jobs at more inland locations. Defendants' characterization of this labor shortage did no more than reflect the general circumstances in Shanghai's labor market. Defendants omitted and the` actual, known circumstances within Diodes' Shanghai facilities.

5.      Diodes' drive for high-volume production levels created a particularly stressful situation in what was already a very labor sensitive work environment in Shanghai. To maintain h i g h production levels in light of emerging worker shortages, the Company restricted holiday leave before the Chinese New Year, causing many workers to resign and return home. Working hours were essentially doubled to four consecutive 12-hour days followed by two rest days. Many workers complained about increased stress and fatigue and ultimately quit when there were no accommodations to the work environment. Also, 2010 year-end bonuses were inadequate which resulted in employees leaving the Company in search of better jobs.

6.      As many as 300 and likely more workers left the Shanghai facilities in early February, 2011. Diodes retained three recruiting companies in Shanghai to replace workers, but they could not keep pace with the departures. Nearly 1,000 new employees were recruited in the first half of 2011, and another 1,000 workers were hired in the second half, resulting in a turnover rate that approached 100%.

7.      This turnover and increasing competition for workers among Shanghai manufacturers put even more pressure on Diodes' Shanghai work force and particularly on senior workers, that is, workers who had two or more years' experience. It is to this group that the training responsibilities for the replacement workers fell. That training would take a month or

more, but the senior workers, who comprised 10 to 20% of the Shanghai facilities' work force, were not relieved of their own manufacturing responsibilities and were expected to run multiple machines while overseeing new, unskilled workers.

8.     In contrast to many other semiconductor companies, Diodes did not subcontract packaging and kept control of these operations. In the packaging process, the semiconductor device is encased in a plastic material that protects the device and allows its handling. These semiconductors, however, were quite small, with many being less than five millimeters in width. The precision required to package the semiconductors efficiently required high skill levels and attention to detail, abilities that could only be instilled through training and would take about six months to achieve. A new worker's packaging efficiency may only be 60% of that of a more experienced worker, resulting in increased production costs and a substantial impact on already narrow profit margins, as fixed production costs could not be offset.

9.     At the same time, Diodes was having problems with its silicon wafer fabrication. These silicon wafers, the semiconductors' foundation, were manufactured in Diodes' Lee's Summit, Missouri facility on outdated and difficult to maintain equipment. The wafer production problems caused delays and defects, further increasing production costs and requiring the return of hundreds of thousands and up to a million dollars' worth of defective wafers from the Shanghai facilities. Given the insufficiently skilled and trained workers at the Shanghai facilities, the delayed and defective wafers added another problem to Diodes' already troubled production processes.

10.     During the time when these events were unfolding at Diodes, certain defendants sold approximately $13.8 million worth of their personally held Diodes stock at artificially

inflated prices.

11.     As a result of defendants' breaches of fiduciary duties alleged herein, the Company has been damaged.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

14.     Plaintiff  is a current shareholder of Diodes and has continuously held Diodes common stock since 2010.  Plaintiff is a citizen of Sweden.

15.     Nominal defendant Diodes, together with its subsidiaries, designs, manufactures, and supplies application specific discrete, logic, and analog semiconductor devices.  Its corporate headquarters is located at 4949 Hedgcoxe Road, Suite 200, Plano, Texas 75024.

16.     Defendant Keh-Shew Lu ("Lu") has served as President and Chief Executive

Officer of Diodes since June 2005 and has served as a director of the Company since 2001. During the Relevant Period, Lu signed Diodes' SEC Forms, including the Form 10-K Report for year end 2010 and the Form 10-Q Report for the first quarter 2011, as well as the accompanying Sarbanes-Oxley certifications.  Upon information and belief, Lu is a citizen of Texas.

17.     Defendant Raymond Soong ("Soong") has been a director of the Company and Chairman of the Board since 1992. Soong has also served as the Chair of the Board's Compensation Committee (the "Compensation Committee"). Upon information and belief, Soong is a citizen of Texas.

18.     Defendant C.H. Chen ("Chen") has been a director of the Company since 2000, and has served as the Vice Chairman of the Board since June 2005. Upon information and belief, Chen is a citizen of Taiwan.

19.     Defendant Michael R. Giordano ("Giordano") has been a director of the Company since 1990. Upon information and belief, Giordino is a citizen of California.

20.     Defendant L.P. Hsu ("Hsu") has been a director of the Company since 2007. Upon information and belief, Hsu is a citizen of Taiwan.

21.     Defendant John M. Stitch ("Stitch") has been a director of the Company since 2000. Upon information and belief, Stitch is a citizen of Texas.

22.     Defendant Michael K.C. Tsai ("Tsai") has been a director of the Company since May 2010. Upon information and belief, Tsai is a citizen of Taiwan.

23.     The defendants referenced above in ¶¶16-22 are referred to herein as the "Director Defendants" or the "Individual Defendants."

## DEFENDANTS' DUTIES

24.     By reason of their positions as officers, directors, and/or fiduciaries of Diodes

and because of their ability to control the business and corporate affairs of Diodes, defendants owed Diodes and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Diodes in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Diodes and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Diodes and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.     Defendants, because of their positions of control and authority as directors and/or officers of Diodes, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Diodes, each of the Defendants had knowledge of material non-public information regarding the Company.

26.     To discharge their duties, the officers and directors of Diodes were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Diodes were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws,

- 7 -

rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

(c) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

27.     According to the Company's Code of Business Conduct (the "Code"), the Company's directors, officers and employees must emphasize "high ethical standards."  The Code further states:

> It is Diodes' policy to comply fully with all applicable laws and regulations in the countries in which we operate and to conduct our affairs according to the highest legal and ethical standards.  The spirit of this Code requires a high degree of integrity in all interactions with all our key stakeholders (i.e. shareholders, employees, officers, directors, customers, suppliers, local communities, government at all levels, and the general public).

28.     The Code details enhanced responsibilities for members of the Board:

> Members of Diodes' Board of Directors have a special responsibility because our directors are prominent individuals with substantial other responsibilities. To avoid conflicts of interest, directors are expected to disclose to their fellow directors any personal interest they may have in a transaction to which Diodes is a party and to excuse themselves from participation in any decision in which there is a conflict between their personal interests and the interest of Diodes.

29.      The Code also contains detailed policies which describe additional obligations for employees with financial reporting responsibilities (including the Chief Executive Officer and all Finance Department personnel):

> As a public company it is of critical importance that Diodes' filings with the Securities and Exchange Commission be accurate, complete, understandable and timely. Depending on their position with Diodes, employees, officers and directors may be called upon to provide information to assure that the Company's (and any of its affiliates') public reports are accurate, complete and understandable. Diodes expects all of its personnel to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

The Finance Department bears a special responsibility for promoting integrity throughout the organization, with responsibilities to stakeholders both inside and outside of the Diodes. The Chief Executive Officer and Finance Department personnel have a special role both to adhere to these principles themselves and also to ensure that a culture exists throughout the Company and its affiliates as a whole that ensures the fair and timely reporting of Diodes' financial results and condition.

Because of this special role, the following Financial Officer Code of Ethics binds the Chief Executive Officer and all members of Diodes' Finance Department, and each agrees that he or she will:

- promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;
- act with honesty and integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships;
- become familiar with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company;
- provide a system for the careful review of all such reports, documents and communications;
- adequately supervise the preparation of the financial disclosure in the periodic reports required to be filed by the Company, including reviewing and analyzing the financial information to be disclosed;
- consult, when appropriate, with professional advisors for advice with respect to such reports, documents and communications; and
- comply with rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies.

30.    The Code further requires:

Each employee, officer and director shall promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships by, among other things:

- Doing what is right. Would you be embarrassed if everyone knew you did it? Then do not do it.
- Acting as a role model for employees under your supervision by acting in an honest and ethical manner.
- Reporting all actual or apparent ethical conflicts to one of the possible reporting channels described below.
- Preventing retaliation against any employee for good faith reporting of violations of this Code or for participating in any investigation relating to a reported violation of this Code.

- Promoting accountability for adhering to this Code by supporting appropriate sanctions for violations.

31.     Pursuant to the Audit Committee's Charter, members are required "to assist the Board in monitoring (1) the integrity of the financial statements of the Company, (2) the compliance by the Company with legal and regulatory requirements and (3) the independence and performance of the Company's internal and external auditors."   In addition, the Audit Committee must make regular reports to the Board.  The Audit Committee Charter also lists the follow requirements:

1. Review and reassess the adequacy of this Charter annually and recommend any proposed changes to the Board for approval.

2. Review the annual audited financial statements with management, including major issues regarding accounting and auditing principles and practices as well as the adequacy of internal controls that could significantly affect the Company's financial statements.

3. Review an analysis prepared by management and the independent auditor of significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements.

4. Review with management and the independent auditor the Company's annual and quarterly financial statements prior to the filing of its Form 10-K and 10-Q.

5. Meet periodically with management to review the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

6. Review major changes to the Company's auditing and accounting

principles and practices as suggested by the independent auditor, internal auditors or management.

7.  Recommend to the Board the appointment of the independent auditor, which firm is ultimately accountable to the Audit Committee and the Board.

8.  Has the authority and responsibility for appointment, compensation, retention, and oversight of the work of independent auditors, including resolution of disagreements between management and the auditors regarding financial reporting.

9.  Pre-approve all audit and permitted non-audit services to be performed by the independent auditors.

10. Receive periodic reports from the independent auditor regarding the auditor's independence consistent with Independence Standards Board Standard 1, discuss such reports with the auditor, and if so determined by the Audit Committee, take or recommend that the Board take appropriate action to oversee the independence of the auditor.

11. Evaluate the performance of the independent auditor and, if so determined by the Audit Committee, recommend that the Board replace the independent auditor.

12. Appoint and replace the senior internal auditing executive.

13. Review any significant reports to management prepared by the internal auditing department and management's responses.

14. Meet with the independent auditor prior to the audit to review the planning

and staffing of the audit.

15. Obtain from the independent auditor assurance that Section 10A of the Securities Exchange Act of 1934 has not been implicated.

16. Obtain reports from management, the Company's senior internal auditing executive and the independent auditor that the Company's subsidiary/foreign affiliated entities are in conformity with applicable legal requirements and the Company's code of conduct.

17. Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 and the requirement of Section 204 of Sarbanes-Oxley Act of 2002 relating to the conduct of the audit before the reports issuance of auditors.

18. Review with the independent auditor any problems or difficulties the auditor may have encountered and any management letter provided by the auditor and the Company's response to that letter. Such review should include:

a. Any difficulties encountered in the course of the audit work, including any restrictions on the scope of activities or access to required information.

b. Any changes required in the planned scope of the audit.

c. The responsibilities, budget and staffing of the internal audit department, if any.

19. Supervise preparation of the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

20. Advise the Board from time to time with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's code of conduct.

21. Meet with the Company's legal counsel to review legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies.

22. Meet at least annually with the Chief Financial Officer, the senior internal auditing executive and the independent auditor in separate executive sessions.

23. Conduct an appropriate review of all related party transactions for potential conflict of interest situations on an ongoing basis, all in accordance with such procedures as the Audit Committee may adopt from time to time.

24. Establish procedures, under confidential and anonymous submission, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting control or auditing matters.

25. While the Audit Committee has the responsibilities and powers set forth in this Charter, I is not the duty of the Audit Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. This is the responsibility of management and the independent auditor.

**SUBSTANTIVE ALLEGATIONS**

**Pre-Relevant Period Background**

32.     Diodes manufactures and supplies application specific, so-called standard products for the various semiconductor markets. Semiconductors are the basic building-block electronic components that provide electronic switching functions and signal amplification in numerous electronic devices. Diodes' semiconductor products are primarily incorporated into consumer electronics, such as LCD and LED TVs, game consoles, and digital media players, and used in other applications in computing, industrial, communications and automotive products. During the Relevant Period, Diodes' primary manufacturing facilities were located in Shanghai, China and were known as Shanghai Kai Hong Electronic Co. Ltd. ("Shanghai Electronic"), and Shanghai Kai Hong Technology Co., Ltd. ("Shanghai Technology") (collectively, the "Shanghai facilities").

33.     Diodes' product portfolio is large, including over 7,000 different products, ranging from limited function diodes to more advanced, yet standard logic chips. Diodes' standard products, however, are near commodities that are produced in large batches for limited, often routine purposes. Consequently, these products are far less costly to develop and manufacture than more sophisticated and complex semiconductor devices. Diodes believes its focus on standard products while using "innovative, highly efficient packaging and cost-effective process technologies, coupled with our collaborative, customer-focused product development," gives it "a meaningful competitive advantage relative to other semiconductor companies." Diodes' business model thus relies on volume sales to generate profit. Indeed, the average sales price for many of Diodes' semiconductor products during the Relevant Period was less than 7¢, with very narrow profit margins. To derive its 2010 net sales revenue of $612.9 million, Diodes shipped over 28 billion units to its customers. Of those customers, 235 were original equipment manufacturers or electronic manufacturing services that had a direct customer relationship with

Diodes.  Diodes also had nearly 55 distributor customers  during the Relevant Period which served

over 10,000 indirect purchasers of Diodes' products.

34.     Although Diodes' product line was varied, many manufacturing processes

followed similar and routinized steps. In a typical and multistep process, electronic circuits are

gradually  created on a silicon wafer which is then cut (or diced) to the desired size (the die). A

metal pad and, if necessary, wires are then connected to the silicon die, and leads (or pins) are

also attached.  The product is then packaged, that is, it is encased in a protective plastic material

that prevents physical damage and corrosion and supports the electrical contacts that allow

the semiconductor to be integrated into an electronic device.

35.     In contrast to its competitors, Diodes did not subcontract its packaging

operations,  instead keeping them in-house at its Shanghai facilities.  Diodes highlighted its

packaging innovations  and spends considerable resources to develop the complicated processes and

sophisticated equipment  necessary to support this process.  As the Company noted in its 2010

Form 10-K Report:

> Our device packaging technology primarily includes a wide variety of
> surface-mount packages.  Our focus on the development of smaller, more thermally
> efficient, and increasingly integrated packaging, is a critical component of our
> product development.  We provide a comprehensive offering of miniature and sub-
> miniature packaging, enabling us to fit components into smaller and more efficient
> packages, while maintaining the same device functionality and power handling
> capabilities.

36.     In early 2011, the Shanghai labor market began experiencing a labor shortage.

Generally, fewer workers were continuing to migrate to Shanghai from their inland homes, as living

costs in coastal cities continued to increase and new manufacturing facilities were opened in more

inland cities, such as Chengdu, China.  At the same time, there was more competition in Shanghai

for available and particularly skilled workers.  And numerous government-ordered minimum wage

increases in Shanghai reduced wage differences among employers, further stoking competition. Also, the Chinese New Year, an important traditional Chinese holiday, fell on February 3, 2011. Workers are typically given three days off for this holiday, although many take more days, as the celebration's festivities can run for 15 days.  And in 2011, this holiday kept many workers from their jobs.  Although these factors were generally impacting the Shanghai labor market, the circumstances at Diodes' Shanghai facilities were, in addition, Company specific – and not disclosed to the investing public.

### Defendants' Relevant Period Statements and Breaches of Fiduciary Duties

37.     On February 9, 2011, defendants caused Diodes to issue a press release announcing its financial results for the fourth quarter and fiscal year of 2010.  For the quarter, the Company reported revenue of $163.8 million, and a gross margin of 38.3 percent.   Defendant Lu, commenting on the fourth quarter results, stated:

> "I am pleased to once again report another solid quarter and year of profitable growth for Diodes.  Our fourth quarter represents our seventh consecutive quarter of sequential revenue growth driven by the continued ramp-up of prior design wins and customer acceptance of our new product portfolio.  We also generated record gross margin primarily due to the benefits of an improved product mix, our aggressive cost reductions, as well as efficiencies at our manufacturing facilities. . . ."

> "For the year, revenue increased over 40 percent and was further highlighted by the achievement of our 20th consecutive year of profitability.  We continue to set new financial records, which highlight our successful execution on new product initiatives and design win traction combined with our exceptional operational and manufacturing performance. These accomplishments reflect the success of our profitable growth model, and we remain committed to achieving growth rates that exceed our addressable markets.  This approach has consistently produced favorable results for Diodes and our shareholders, and we plan to continue to execute on this proven strategy."

38.     Regarding the first quarter and 2011 generally, defendant Lu further stated:

> "Our achievements in 2010 have generated strong momentum as we enter 2011.  Our future growth will continue to be driven by consistent design win traction, new

product initiatives and additional opportunities to capitalize on Zetex cross-selling synergies.  Although typically a seasonally slower period, our current environment appears to be exhibiting stronger seasonal demand than in previous first quarters. We are increasing assembly/test equipment capacity in first quarter, but our manufacturing output is being affected by reduced equipment utilization caused by China labor shortages and fewer working days and the Chinese New Year in February.  As such, we expect revenue for the first quarter of 2011 to be flat to down five percentage points compared to fourth quarter 2010.  In addition to the impact on revenue, equipment utilization is also affecting our gross margin which we expect to be 36.5 percent, plus or minus one percentage point. Operating expenses are expected to be comparable to the fourth quarter level on a percent of revenue basis."

39.     Following the press release's issuance, defendants held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations.  With regard to the Company's outlook for 2011, defendant Lu reiterated:

Although typically a seasonally slow period, our current environment appear[s] to be exhibiting stronger season demand than in the previous first quarter.

Discussing the Company's first quarter of 2011 in more detail, defendant White stated:

We expect equipment capacity to increase approximately 4% in the first quarter, but total output will be down approximately 9%, due to reduced equipment utilization because of the recent China labor shortages in the Coastal regions, coupled with fewer working days and the Chinese New Year holiday in February.

*        *        *

*Turning to our outlook, in terms of first quarter guidance, we are increasing assembly test equipment capacity in first quarter. But our manufacturing output is being affected by reduced equipment utilization, caused by China labor shortages and fewer working days and the Chinese New Year holiday in February*.

With regard to the Company's gross profit margin, defendant White stated: "Gross margin will also be influenced by our China wage increases, and start-up costs associated with our new Chengdu assembly facility."  Ramesh Misra, a securities analyst from Brigantine Advisors, posed a pointed question to defendant Lu about the emerging worker shortage:

In regards to the labor shortages, Dr. Lu, this is actually the first time I think you have ever brought this up.

Are there any abnormal drivers for that? Or was it – is it mostly related to  the, to the New Year holidays?  And do you expect the labor issues to be resolved by Q2?

Defendant Lu responded:

*Okay, number one, to answer you, the problem should be resolved by Q2*,  yes. But the reason they are unusual than before, is China just announced this fifth  so-called five-year plan. China's government always, every five years, they have this so-called five-year plan.  They just announced the 12th, five-year plan.

And this five-year plan start to put a lot of emphasis in the inland economic  or inland situation than the [coast]. So China want to push the development in the inland faster than the [coast], such that their economics is much balanced than before.

And in the before, China put a lot of emphasis in the [coast], such that the [coast] begins to go way up and then cause this infraction and this infraction caused a  lot of embarrass between the rich and poorer.

So the government tried to stabilize the situation, and tried to push the development in the inland of China and therefore, you know, you get more emphasis, more money, developed in that area.

*And that cause the labor, instead of go to [coast], to picket [chaw]. The labors start to go back and don't go back.  Okay?*

*In addition to that is the weather and the transportation problem.  People  go home for Chinese New Year sooner than before.  And that is what happened  to us.  So all those things caused the labor shortage. But we . . . believe in the second quarter – actually, we start hiring more people. But don't forget, it take us six, eight week of training before they can be productive*.

40.     On this news, Diodes' stock rose sharply, increasing $3.98 per share to close at $29.62 per share on February 10, 2011, a one-day increase of over 15%. The Company's stock traded on heavy volume on February 10, trading over 1.4 million shares or nearly six times its average three-months trading volume. Market or industry events or forces cannot explain this  significant change in the Company's stock price from the previous day.

41.     Defendants' breached their fiduciary duties to the Company  by making the

above statements which failed to disclose material information concerning the labor shortages at Diodes' Shanghai facilities and the resulting disruptions to its operations.

42.    Despite the failure of defendants to timely disclose this material information, between February 10, 2011 and May 2, 2011, defendant Lu sold 179,771 shares of his personally held Diodes stock, reaping gross proceeds of $5.7 million.

43.    On May 9, 2011, Diodes issued a press release announcing its financial results for the first quarter of 2011, ending March 31, 2011.   For the quarter, the Company reported revenue of $161.6 million, and a gross profit margin of 35.5% of sales.   Defendant Lu, commenting on the results, stated:

"Our revenue for the quarter was stronger than typical first quarter seasonal patterns, resulting from market share gains in tablets, notebooks, smartphones and LED TVs. We had a strong quarter in Europe and Asia, while North America revenue declined sequentially. ***The quarter was impacted by reduced unit output from our Shanghai packaging facilities resulting from lower equipment utilization caused by China labor shortages mentioned last quarter and a larger than normal number of workers not returning from the Chinese New Year holiday***. We shipped from finished goods inventory and reduced our contract assembly commitments, which allowed us to achieve sequential revenue growth in our core business.  Gross margin for the quarter reflects reduced fixed cost coverage caused by the lower unit output. ***We continue hiring manufacturing operators to ensure maximum equipment utilization by matching fully-trained manpower with the available equipment. Overall, I am pleased with our results as we continue to execute on our profitable growth model, new product initiatives and design win traction, which will contribute to our growth in the coming quarter and year***."

44.    With regard to the Company's second quarter of 2011, defendant Lu continued to reassure investors about Diodes' performance:

"For the second quarter of 2011, we expect to achieve growth over the first quarter and further expand our market share as a result of our continued focus on design wins, new products and customer expansion. We expect revenue for the second quarter of 2011 to range between $170 million and $178 million, an increase of 5 to 10 percent sequentially. We expect gross margin to be comparable to the first quarter.  Operating expenses are expected to be down slightly from the first quarter levels on a percent of revenue basis. We expect our income tax rate to range between 17 and 23 percent. Shares used to calculate GAAP EPS for the second

quarter are anticipated to be approximately 47.5 million."

45.     Following the first quarter press release, defendants held a conference call with securities analysts and investors to discuss the earnings announcement and the Company's operations.  With regard to the Company's results, defendant Lu explained that "[t]he quarter was impacted by reduced image output from our Shanghai packaging facilities, resulting from lower equipment utilization caused by China labor shortages mentioned last quarter, and a normal number of workers not returned from the Chinese New Year holiday." Defendant Lu further stated that the Company was continuing to hire manufacturing operators to compensate for the labor shortages, but that it would "require additional time to properly train those individuals." Nevertheless, defendant Lu sought to reassure investors, publicly declaring "*we expect the labor situation to be resolved during the second quarter and anticipate gross margin will be comparable to the first quarter*."

46.     Commenting further on the Company's gross margin for the first quarter, defendant White stated that the "sequential decline in gross margin was primarily due to the previously mentioned manpower shortages at our China packaging facilities which resulted in lower equipment utilization and reduced fixed cost coverage." Defendant White reaffirmed defendant Lu's earlier guidance, stating that "[w]e expect the gross margin to be comparable to the first quarter."

47.     Also on the morning of May 10, 2011, defendant White presented at the Bank of America Merrill Lynch Small and Mid-Cap Conference. When asked about the labor shortage, including when the Company first realized there was a problem and how they were managing it, defendant White reiterated the May 9th disclosures and clarified that the labor problems at the Shanghai facilities would not be remediated in a six-to-eight-week period:

From a when did we see it standpoint, I think we saw right at Chinese New Year. The people leaving and not coming back after Chinese New Year was bigger than we expected. ***We've since replaced those people, and we're in the training phase now. It takes six to eight weeks to train a person before you can just take them on the line and have them run a machine, but it takes about six months before they become efficient at running the semiconductor process.***

As far as how we're addressing it, we do not believe that it's more of a phenomena along the Shanghai coastal area, and you see these people that used to come to Shanghai to get a job from the interior, they are now staying in the interior and they can find a job like in Chengdu. And that's one of the reasons that you see Chengdu, big companies going to that area, in that the people are there.

48.     Following these revelations that the labor shortage in Shanghai was more severe in scale and duration than previously indicated, Diodes' stock fell nearly 10% to close at $30.51 per share, on heavy volume, on May 10, 2011. This significant stock price decline cannot be explained by market or industry events or forces. Nonetheless, despite this decline, Diodes' stock price remained artificially inflated as defendants continued to conceal the full extent of the Company's labor and operations problems in its Shanghai facilities.

49.     Defendants' statements and assurances failed to fully disclose material information concerning the labor shortages at Diodes' Shanghai facilities and the resulting disruptions to its operations. These failures constitute a breach of defendants' fiduciary duties to the Company.

50.     On June 9, 2011, defendants caused to be issued a press release updating the Company's guidance for the second quarter of 2011. For the second quarter, the Company maintained its revenue guidance of $170 to $178 million, but lowered its gross margin guidance to 32.5% (plus or minus 1.5%) from its previous publicly stated support for a 36.5% (plus or minus 1%) gross margin. Through this release, defendants finally acknowledged that the labor shortages in Diodes' Shanghai facilities were continuing without any clear indication of when to expect a "recovery" from those problems. Defendants also acknowledged that the

consequences of the Shanghai facilities' labor shortage were still very much present and were still

impacting the Company's gross profit margin:

> The Company is lowering its gross margin guidance to 32.5 percent plus or minus
> 1.5 percent, versus its previous guidance of comparable to the first quarter. Gross
> margin is being impacted by a mix shift due to a softening of demand and the slower
> than expected recovery from the previously disclosed manpower shortages at the
> Company's China packaging facilities.

51.     Following this disclosure, Diodes' stock fell nearly 14% to close at $23.61 per

share on June 10, 2011, a significant change from the previous day that cannot be explained by

market or industry events or forces.  Moreover, the stock traded on volume of over 1.5 million

shares—nearly five times the average three-months trading volume for Diodes' stock.

52.     On August 9, 2011, defendants caused to be reported that Diodes had missed the

second quarter of 2011 revenue target they had stated only two months earlier and that gross margin

had shrunk to 32.8%.  Defendant Lu further acknowledged that the true impact of the labor problems

in the Shanghai facilities was not over:

> "***Additionally, there was a slower than expected ramp in productivity due to the
> training requirements for replacing operators as a result of the previously
> announced China labor shortages. We expect this productivity issue to be resolved
> by the end of the third quarter***.  We have taken several actions, including the delay
> of capital investments and the freezing of manufacturing manpower, until such time
> that the demand environment improves."

53.     Not surprisingly, defendant Lu continued to downplay the scope of the Company's

ongoing labor problems.  In the August 9 securities analyst and investor conference call following

the second quarter earnings release, Lu stated:

> Additionally, there was a slower than expected ramp in productivity due to the
> trending requirement for replacing operators as a result of the previously
> announced (inaudible) shortage. Although it took longer than anticipated we
> currently expect to have 4 trained operators in place by the end of the third quarter.
> That four trained operators would be sufficient to remediate the pervasive

consequences of the persisting labor problems was simply untenable.

54.     The breaches of fiduciary duties alleged herein caused massive damages to the Company. As a result of these false and misleading statements, Diodes' common stock traded at artificially inflated prices during the Relevant Period. However, once defendants' breaches of fiduciary duties were fully disclosed, the Company's shares were hammered, causing them to plummet more than 14% in the day following the disclosure. The Company's stock price has yet to fully recover. In addition, defendants' breaches also led to the filing of a securities class action lawsuit on behalf of purchasers of Diodes stock. This securities class action names defendant Lu as well as the Company as defendants and seeks millions in damages.

55.     Accordingly, the Company has been damaged.

## INSIDER TRADING BY DEFENDANTS LU, CHEN, GIORDANO, SOONG AND STITCH

56.     Defendants, because of their positions with Diodes, controlled the contents of the Company's public statements, press releases and quarterly and annual reports disseminated throughout the Relevant Period. Defendants were provided with or had access to copies of the reports and press releases alleged to omit material information and to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information, defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that their representations were misleading. As a result, each of the defendants is responsible for the accuracy of Diodes' corporate statements and is therefore responsible and liable for the misleading statements and omissions contained therein and for trading on known nonpublic information.

57.     Defendants were motivated to engage in this course of conduct in order to

enable certain Company insiders, including Diodes' CEO, defendant Lu, and five of the seven Board members to collectively sell 452,453 shares of their personally held Diodes common stock for gross proceeds in excess of $13.8 million. As detailed further herein, the insiders' trades were unusual and suspicious in nature and were timed to take advantage of immediate artificial inflation of Diodes' stock price, at the expense of unwitting investors.

58. Defendant Lu was particularly fortunate in his Relevant Period trades. Defendant Lu was appointed CEO in June 2005. In the six years before the Relevant Period's start, defendant Lu engaged in minimal trading, selling only 20,229 shares of his personally held Company stock for gross proceeds of $547,812. In sharp contrast to his pre- Relevant Period sales, defendant Lu sold 179,771 shares of his personally held Company stock reaping $5.7 million in gross proceeds during the four- months between the start of the Relevant Period and the true facts coming to light – *a tenfold increase from his previous insider trading activity*.[1]

---

[1] According to the Form 4 Reports defendant Lu filed with the SEC in connection with his trades, trading was done under a 10b5-1 trading plan. The SEC established 10b5-1 plans in 2001. Such plans permit insiders of publicly traded corporations to adopt a specific trading plan for the acquisition or disposition of company stock. A 10b5-1 trading plan allows a corporate insider to buy or sell a predetermined number of shares at a predetermined time.

Beginning in November 2012, the *Wall Street Journal* published a series of articles on the potential abuse of 10b5-1 trading plans. The *Journal*'s investigation found that corporate insiders, including those who trade under 10b5-1 trading plans, have generated significant profit or avoided significant losses by trading just days before their companies issued market-making news. In many instances, the corporate insiders trading under 10b5-1 plans actually outperformed the market. Thereafter in response to the *Journal*'s investigation, the U.S. Attorney's Offices and the SEC initiated investigations into possible abuses by corporate executives using 10b5-1 trading plans.

In defendant Lu's case, the unusual and suspicious nature of his trading negates any protection from having a plan in place. Moreover, defendant Lu's Form 4 Reports appear to be misleading as they state that the sales are made "pursuant to *previously filed* 10b5-1 Plan." While a company is under no obligation to file a 10b5-1 trading plan with the SEC, a company may file the plan in order to provide its investors with a greater level of transparency. Despite defendant Lu's representation that the purported 10b5-1 has been "previously filed," plaintiff's

59.     Defendant Lu's post-Relevant Period trading shows a similar difference, as he only sold 631 shares of his personally held Company stock for gross proceeds of $14,809, in the two years following disclosure of the true facts alleged herein. ***Moreover, defendant Lu's Relevant Period sales were particularly prosperous as they occurred at a time when Diodes' stock was trading near an all-time high.***

60.     Diodes' stock price was artificially inflated during the Relevant Period when the Company insiders sold their stock due to defendants' misleading statements and omissions regarding the extent and severity of the labor problems at the Company's Shanghai facilities and the effects on its operations and financial performance. The vast majority of Diodes' insider selling occurred before the first negative disclosure on May 9, 2011, ***including all of defendant Lu's insider trading*** and are reflected in the chart below:

| Date of Stock Trade | Number of Shares Sold | Price | Gross Proceeds |
|---|---|---|---|
| 10-Feb-2011 | 20,000 | $29.00 | $580,000 |
| 10-Feb-2011 | 19,771 | $28.00 | $553,588 |
| 16-Feb-2011 | 20,000 | $30.00 | $600,000 |
| 18-Feb-2011 | 12,906 | $31.00 | $400,086 |
| 04-Mar-2011 | 7,094 | $31.01 | $219,985 |
| 23-Mar-2011 | 20,000 | $32.00 | $640,000 |
| 24-Mar-2011 | 20,000 | $33.00 | $660,000 |
| 25-Mar-2011 | 20,000 | $33.50 | $670,000 |
| 25-Mar-2011 | 20,000 | $34.00 | $680,000 |
| 31-Mar-2011 | 8,849 | $34.50 | $305,291 |
| 02-May-2011 | 11,151 | $34.50 | $384,710 |
| **Totals** | 179,771 | | $5,693,659 |

61.     These trades were made at an extremely profitable time for defendant Lu. Between 2005 and the present, Diodes' common stock has traded between a low of $3.44 (during the depth of the "Great Recession" in November 2008) and a high of $34.70.  Of the nine

counsel has been unable to retrieve a copy of his plan from any searchable database containing SEC filings.

discreet trades above, only the sales on February 10, 2011, failed to capture less than 90% of Diodes' all time high stock price. Lu's sales during March and May of 2011 captured between 90% and 99% of Diodes' all time high stock prices. As stated above, on May 10, 2011, Diodes' stock fell approximately 10% to close at $30.51 per share. Thereafter, on June 10, 2011, Diodes stock dropped an additional 14% (upon the full disclosure of the details regarding labor shortages, labor difficulties, and gross margin decreases) to close at $23.61 per share. Defendant Lu's trades in the short period before these revelations allowed him to cash out at a time when Diodes' common stock price was buttressed by his own breaches of fiduciary duties.

62.     Unfortunately, defendant Lu was not alone in taking advantage of his insider knowledge in order to profit from sales of Company stock. The Company's directors further engaged in insider trading in violation of Diodes' own internal policy. Under Diodes' insider trading policy in effect in 2011, the Company's officers, directors and employees were prohibited from engaging in any insider trading "while in possession of . . . material, non-public information about the Company obtained in the course of employment." Of particular note, five of Diodes seven Board members (a majority) reaped gains from sales of Diodes stock while in possession of material, non-public information.

63.     During the Relevant Period, defendant Chen sold approximately 80,000 shares of Diodes stock at artificially inflated prices, for total gross proceeds in excess of $2 million. The shares defendant Chen sold during the Relevant Period are detailed below:

| Date of Stock Trade | Number of Shares Sold | Price | Gross Proceeds |
|---|---|---|---|
| 02-Mar-2011 | 3,413 | $30.50 | $104,097 |
| 03-Mar-2011 | 21,587 | $30.73 | $663,369 |
| 04-Mar-2011 | 55,000 | $31.36 | $1,724,800 |
| Totals | 80,000 | | $2,492,265 |

64.     As a director, defendant Chen knew, no later than March 4, 2011 (the date of his

latest stock sales) of the near-term challenges facing the Company, including: (i) labor turnover and shortages; (ii) production problems with silicon wafer fabrication; and (iii) falling gross profit margins yet still made the above-listed trades.  Defendant Chen's trades captured 88% of Diodes' all time high stock price.

65.     During the Relevant Period, defendant Giordano sold approximately 30,000 shares of Diodes stock at artificially inflated prices, for total gross proceeds in excess of eight hundred thousand dollars. The shares defendant Giordano sold during the Relevant Period are detailed below:

| Date of Stock Trade | Number of Shares Sold | Price | Gross Proceeds |
|---|---|---|---|
| 15-Mar-2011 | 10,000 | $28.01 | $280,100 |
| 16-May-2011 | 10,000 | $29.58 | $295,800 |
| 15-Jun-2011 | 10,000 | $24.00 | $240,000 |
| Totals | 30,000 | | $815,900 |

66.     As a director, defendant Giordano knew, no later than June 15, 2011 (the date of his latest stock sales) of the near-term challenges facing the Company, including: (i) labor turnover and shortages; (ii) production problems with silicon wafer fabrication; and (iii) falling gross profit margins yet still made the above-listed trades.

67.     During the Relevant Period, defendant Soong sold approximately 58,000 shares of Diodes stock at artificially inflated prices, for total gross proceeds in excess of 1.7 million dollars. The shares defendant Soong sold during the Relevant Period are detailed below:

| Date of Stock Trade | Number of Shares Sold | Price | Gross Proceeds |
|---|---|---|---|
| 22-Feb-2011 | 24,220 | $29.68 | $718,850 |
| 25-Feb-2011 | 33,610 | $29.57 | $993,848 |
| 28-Feb-2011 | 295 | $29.65 | $8,747 |
| Total | 58,125 | | $1,721,444 |

68.     As a director, defendant Soong knew, no later than Feb. 28, 2011 (the date of his

latest stock sales) of the near-term challenges facing the Company, including: (i) labor turnover and shortages; (ii) production problems with silicon wafer fabrication; and (iii) falling gross profit margins yet still made the above-listed trades.

69.     During the Relevant Period, defendant Stitch sold approximately 10,000 shares of Diodes stock at artificially inflated prices, for total gross proceeds in excess of two-hundred thousand dollars. The shares defendant Stitch sold during the Relevant Period are detailed below:

| Date of Stock Trade | Number of Shares Sold | Price | Gross Proceeds |
|---|---|---|---|
| 15-Feb-2011 | 10,000 | $29.25 | $292,500 |

70.     As a director, defendant Stitch knew, no later than Feb. 15, 2011 (the date of his latest stock sales) of the near-term challenges facing the Company, including: (i) labor turnover and shortages; (ii) production problems with silicon wafer fabrication; and (iii) falling gross profit margins yet still made the above-listed trades.

71.     Each of the above Insider Trading Defendants sold Diodes common stock at close to all-time high prices and shortly before negative disclosures which led to double-digit percentage declines in Diodes' stock price.   The chart shown below depicts Diodes' stock performance since January 1, 2000. The second chart shows stock performance just since January 1, 2010 to the present.  Both charts highlight the short 3 month window during which the insider trades by the Insider Trading Defendants occurred.





## DERIVATIVE AND DEMAND ALLEGATIONS

72.     Plaintiff brings this action derivatively in the right and for the benefit of Diodes to redress injuries suffered and to be suffered by Diodes as a result of the breaches of fiduciary duties and other violations of law by Defendants.

73.     Plaintiff will adequately and fairly represent the interests of Diodes and its shareholders in enforcing and prosecuting its rights.

74.     As a result of the facts set forth herein, Plaintiff has not made a demand on the Board to initiate this action against the Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

75.     The Director Defendants face a substantial likelihood of liability in this action because they caused Diodes to issue false and misleading statements concerning Diodes's business practices, particularly with regard to: (i) labor turnover and shortages; (ii) production problems with silicon wafer fabrication; and (iii) falling gross profit margins.  These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation, damaging the Company.

76.     At the time this Action was initiated, defendants Lu, Soong, Chen, Giordano, Hsu, Stitch and Tsai served on Diodes' seven-member Board.  As discussed below, demand was futile because a majority of the Board lacked independence and/or was not disinterested and could not have exercised impartial business judgment if Plaintiff had made a demand.

### Defendant Lu Lacks Independence and Faces a Substantial Likelihood of Liability

77.     While serving as a director of Diodes, defendant Lu's principal profession was his position with the Company and his livelihood depended on the substantial monetary and

other compensation he received from Diodes.  Since Lu has served as a senior executive officer of the Company within the past three (3) years, Diodes must concede that Lu is not independent under either NASDAQ's listing standards or Diodes' own standards for director independence. In fact, Diodes conceded that defendant Lu is not independent in its 2013 Proxy Statement on SEC Form DEF 14A.

78.     Defendant Lu also faces a substantial likelihood of personal liability for breaching his fiduciary duties of loyalty and good faith by obtaining improper personal financial benefits relating to his loan from the Company.  By artificially inflating the value of Diodes' stock in order to sell more than $5 million worth of Diodes' common stock, Lu preferred his own interests over those of Diodes.  Because defendant Lu faces a substantial likelihood of liability for breaching his fiduciary duties of loyalty and good faith, demand upon him is futile.

**Likelihood of Substantial Liability of the Audit Committee Defendants**

79.     Defendants Giordano (Chair), Hsu and Stitch each serve on the Audit Committee of Diodes' Board.  Giordano, Hsu and Stitch served on the Audit Committee during the Relevant Period.  Giordano, Hsu and Stitch sat on the Audit Committee during each of the acts and omissions alleged herein.  As such, they will take no action against one another or the other members of the Board of Directors or the other defendants because each member of this Committee breached important specific duties as Audit Committee members.  The Audit Committee is responsible, by its Charter, to:

   a.  the integrity of the Company's financial statements and internal controls;

   b.  the qualifications, independence and performance of the Company's independent auditor;

   c.  the performance of the Company's internal audit function; and

   d.  the Company's compliance with legal and regulatory requirements.

80. Thus, the Audit Committee was directly responsible for overseeing and directly participating in Diodes' financial reporting process. Defendants Giordano, Hsu and Stitch breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee failed to provide accurate financial disclosures to investors during the Relevant Period. Specifically, these defendants reviewed and approved Diodes' improper press releases and SEC filings that misrepresented the Company's (i) labor turnover and shortages; (ii) production problems with silicon wafer fabrication; and (iii) falling gross profit margins. The Audit Committee members either knew or should have known of these misrepresentations given their size, scope, and blatancy, yet they failed to prevent or correct the issuances of these false and misleading statements. Such conduct is not protected by the business judgment rule.

81. As a result of the Audit Committee's failures, defendants Giordano, Hsu and Stitch face a substantial likelihood of liability for breaches of fiduciary duties, making any demand upon them futile.

**Likelihood of Substantial Liability of the Insider Trading Defendants**

82. Defendants Lu, Chen, Giordano, Soong and Stitch each possessed access to high level internal corporate documents during the Relevant Period. Moreover, in furtherance of their duties as corporate officers and/or directors, each had conversations with other corporate officers, employees and directors and attended management and/or Board meetings. As a result, each of the Director Defendants knew the adverse non-public information concerning the Company with respect to (i) labor turnover and shortages; (ii) production problems with silicon wafer fabrication; and (iii) falling gross profit margins. While in possession of this material, non-public information regarding the accounting issues ongoing at the Company, defendants Lu, Chen, Giordano, Soong and Stitch each participated in illegal insider selling during the Relevant

Period:

      i.     Lu sold 179,771 shares of Diodes stock for proceeds of $5,693,659;

     ii.     Chen sold 80,000 shares of Diodes stock for proceeds of $2,492,265;

    iii.     Giordano sold 30,000 shares of Diodes stock for proceeds of $815,900;

    iv.     Soong sold 58,125 shares of Diodes stock for proceeds of $1,721,444;

     v.     Stitch sold 10,000 shares of Diodes stock for proceeds of $292,500.

83. As a result, defendants Lu, Chen, Giordano, Soon and Stitch are interested because they received a personal financial benefit from the challenged insider trading transactions. Lu, Chen, Giordano, Soon and Stitch also face a sufficiently substantial likelihood of liability for breach of their fiduciary duties for insider selling. Accordingly, demand is excused for defendants Lu, Chen, Giordano, Soon and Stitch.

**Defendants Lu, Stitch, Chen and Soong's Extensive Professional Ties Creates a Reasonable Doubt That These Directors Would Independently Consider a Demand to Institute an Action Against the Other**

84. Defendants Lu, Stitch, Chen and Soong all worked together at Texas Instruments Taiwan in various senior and executive roles together throughout the 70s and through the 1990s. These individuals extensive professional history together is even more relevant given that a majority on the Board consists of colleagues from Texas Instruments.

85. These defendants all have long service together on Diodes' Board. Defendant Soong has been a director (as well as Chairman) since 1992. Defendant Chen has served on the Board since 2000. Defendant Lu has served since 2001. Defendant Stitch has served on the Board since 2000.

**Demand Is Futile as to Defendants Soong, Chen, Hsu and Lu Because of Their Interrelated Business Ties Through Lite-On Semiconductor Corporation**

86.     Defendant Soong co-founded Lite-On Semiconductor Corp. ("Lite-On"), a Taiwan-listed public company. Soong currently serves as Lite-On's Chairman of the board of directors. Lite-On's current Vice-Chairman is defendant Chen. Lite-On currently owns more than 8.3 million shares of Diodes common stock – or approximately 18.2% of the Company. Defendant Hsu currently serves as a consultant to Lite-On. Defendant Lu currently serves on Lite-On's board of directors.

87.     Therefore, Defendants Soong, Chen, Hsu and Lu are unable to evaluate a demand to bring litigation against themselves (and in particular defendant Lu) in an independent and disinterested manner. Demand is futile as to Defendants Soong, Chen, Hsu and Lu.

**Additional Likelihood of Substantial Liability and Lack of Independence of the Board of Directors**

88.     The Director Defendants are also exposed to substantial potential liability in this action because of their failure to put or enforce appropriate financial and legal compliance controls in place to assure the accuracy of information disclosed by Diodes' senior management to the public. Members of the Board have had knowledge of the wrongdoing and did nothing to prevent it, to stop it, or to prosecute this action. They have ratified the wrongdoing alleged herein.

89.     The Code clearly defines the duties of the Director Defendants. The Code requires the Director Defendants to, *inter alia*:

  a.  comply with all applicable local, state and federal laws and regulations;

  b.  refrain from illegal, dishonest or unethical conduct;

  c.  follow both the letter and the spirit of the law;

    d.   comply with all Diodes policies and procedures;

    e.   refrain from establishing improper, misleading, incomplete or fraudulent accounting documentation or financial reporting; and

    f.   refrain from signing any documents believed to be inaccurate or untruthful.

90.    Each and every Director Defendant was bound by the provisions found in the Code.  Each and every Director Defendant breached the Code, and in doing so, breached their fiduciary duties to the Company, by causing the Company to issue false statements and/or omit material information.

91.    The Director Defendants reviewed, prepared and/or signed the materially false and misleading press releases and financial statements during the Relevant Period. Consequently, the Director Defendants are exposed to a high likelihood of substantial liability in this action, and are therefore, incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

92.    Additionally, despite the fact that there is currently pending a related securities fraud class action complaint against individual defendant Lu (Case No. 6:13-cv-00247-MHS), filed in the Eastern District of Texas, Tyler Division, the Board has taken no action whatsoever to hold defendant Lu responsible or to pursue redress against such individuals on behalf of the Company.  The *actual failure* of the Director Defendants to pursue redress on behalf of the Company constitutes substantial proof that such defendants are not independent and objective, since directors have a duty to pursue claims belonging to the Company.

93.    The Board of Diodes approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise these wrongs from Diodes shareholders or recklessly disregarded the wrongs complained herein, and cannot be considered

disinterested parties.   Each of the defendants exhibited a systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

94.      In order to bring this suit, the Board would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

95.      The acts complained of constitute violations of the fiduciary duties owed by Diodes' officers and directors and these acts are incapable of ratification.

96.      Diodes has been, and will continue to be subjected to lawsuits for the actions described herein, yet the defendants and Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Diodes any part of the damages the Company has suffered and will continue to suffer.

97.      The actions of the Director Defendants has impaired the Board's ability to validly exercise its business judgment and has rendered it incapable of reaching an independent decision as to whether to accept Plaintiffs' demands.

98.      Any suit by the directors of Diodes to remedy these wrongs would likely expose the defendants and Diodes to further violations of securities laws which could result in additional civil actions being filed against one or more of the Board members.   In light of this, they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

99.      Indeed, Diodes has already expended and will continue to expend significant sums of money as a result of the illegal and improper actions described herein.   Such expenditures will include, but are not limited to:

a.  Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

b.  Costs and legal fees for defending Diodes and certain of the defendants against the Class Action litigation arising from illegal and improper conduct alleged herein.

100.    Plaintiff has not made any demand on the shareholders of Diodes to initiate this action since demand on the shareholders would be a futile endeavor for the following reasons:

a.  Diodes is a publicly held company with a current market capitalization in excess of $1.1 billion and approximately 46 million shares outstanding;

b.  Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

c.  Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

101.    Finally, the members of the Board, as described herein, receive substantial monetary and other compensation for their service as Board members, amounts that are far in excess of standard director compensation.  For this reason alone, the entire Board could not disinterestedly consider a demand due to the substantial compensation each Director Defendant stands to lose.

102.    Based upon the foregoing, Plaintiff has not made a demand on the Board to initiate this action against the Defendants.  Such demand would be a futile and useless act because a majority of the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

## COUNT I
## AGAINST ALL DEFENDANTS FOR BREACHES OF FIDUCIARY DUTIES FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

103.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

104.     As alleged in detail herein, each of the defendants (and particularly the Audit Committee members) had a duty to ensure that Diodes disseminated accurate, truthful and complete information to its shareholders.

105.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Diodes shareholders materially misleading and inaccurate information through, *inter alia*, Diodes filings and other public statements and disclosures as detailed herein.   These actions could not have been a good faith exercise of prudent business judgment.

106.     As a direct and proximate result of defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
## AGAINST ALL DEFENDANTS FOR BREACHES OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

107.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.     As alleged herein, each of the defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

109.     Defendants willfully ignored the obvious and pervasive problems with Diodes' internal controls' practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

110.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
## AGAINST ALL DEFENDANTS FOR BREACHES OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

111.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.     Defendants owed and owe Diodes fiduciary obligations.  By reason of their fiduciary relationships, defendants specifically owed and owe Diodes the highest obligations of good faith, fair dealing, loyalty and due care.

113.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

114.     As a direct and proximate result of defendants' failure to perform their fiduciary obligations, Diodes has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

115.     As a result of the misconduct alleged herein, defendants are liable to the Company.

116.     Plaintiff, on behalf of Diodes, has no adequate remedy at law.

## COUNT IV
## AGAINST THE DEFENDANTS FOR UNJUST ENRICHMENT

117.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

118.     By their wrongful acts and omissions, each and every defendant was unjustly enriched at the expense of and to the detriment of Diodes.

119.     Plaintiff, as a shareholder and representative of Diodes, seek restitution from these defendants, and each of them, and seek an order from this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and breaches of fiduciary duties.

### COUNT V
### AGAINST DEFENDANTS LU, CHEN, GIORDANO, SOONG AND STITCH FOR BREACHES OF FIDUCIARY DUTIES FOR SELLING STOCK BASED ON KNOWLEDGE OF MATERIAL, NON-PUBLIC INFORMATION

120.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.     At the time of the Company's public offerings, defendants Lu, Chen, Giordano, Soong and Stitch knew, but did not disclose to the public, material non-public information regarding the Company's true condition, particularly with respect to (i) labor turnover and shortages; (ii) production problems with silicon wafer fabrication; and (iii) falling gross profit margins, and as alleged herein, these defendants made the stock sales described herein on the basis of and because of their knowledge of that material non-public information, which was a breach of their fiduciary duties of loyalty and good faith.

122.     As a result of their foregoing breaches of fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds defendants Lu, Chen, Giordano, Soong and Stitch obtained thereby.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     Against all defendants and in favor of the Company for the amount of damages

sustained by the Company as a result of defendants' breaches of fiduciary duties;

B.      Directing Diodes to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein, including, but not limited to;

(1)      strengthening the Board's supervision and oversight responsibilities and developing a system to ensure the Board accurately manages the Company's risk potential;

(2)      allowing the Company's shareholders to nominate at least two candidates for election to the Board;

(3)      a proposal to strengthen Diodes' oversight of its disclosure procedures;

(4)      a provision to control insider selling;

(5)      a policy of ensuring the accuracy of the qualifications of the Company's directors, executives, and other employees;

C.      Awarding to Diodes restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 20, 2014                        THE WARNER LAW FIRM

                                                                *s/Paul T. Warner*
                                                                PAUL T. WARNER
                                                                SBN: 00791884
                                                                Federal Bar No. 25143

11123 McCracken Circle, Suite A
Cypress, TX 77429
Telephone:  (281) 664-7777
Facsimile:  (281) 664-7774
pwarner@warner-law.net

THE WEISER LAW FIRM
ROBERT WEISER
BRETT STECKER
DAVID PROMISLOFF
22 Cassatt Avenue, Berwyn, PA 19312
Phone: (610) 225-2677
Fax: (610) 408-8062
rw@weiserlawfirm.com
bds@weiserlawfirm.com
dmp@weiserlawfirm.com

THE SHUMAN LAW FIRM
KIP B. SHUMAN
RUSTY E. GLENN
885 Arapahoe Ave.
Boulder, CO 80302
Telephone: (303) 861-3003
Facsimile: (303) 484-4886
kip@shumanlawfirm.com
rusty@shumanlawfirm.com

## DIODES INCORPORATED VERIFICATION

I, Magnus Persson, hereby verify that I am familiar with the allegations in the Complaint, that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 2014 02 12

Magnus Persson